United States District Court
Southern District of Ohio
Eastern Division

**James Nixon, et al.,**

    **Plaintiffs,**

    **v.**

**Northern Local School District
Board of Education, et al.,**

    **Defendants.**

**Case No. 2:04-cv-1149
JUDGE SMITH
Magistrate Judge King**

## OPINION AND ORDER

Plaintiffs James Nixon, John Nixon, and Cathleen Nixon seek a preliminary and permanent injunction (Doc. 3) against defendants Northern Local School District Board of Education, Jack Porter, Tom Dorman, and Rich Warren.[1] Specifically, plaintiffs seek to enjoin the defendants from enforcing Sheridan Middle School's policy prohibiting plaintiff James Nixon from wearing a specific T-shirt to school. Plaintiffs also seek nominal damages. For the following reasons, the Court GRANTS plaintiffs' motion for a preliminary and permanent injunction.

## I. INTRODUCTION

It is reasonable in this day and age that school officials would be concerned about the general effect a shirt's message could have on other students. In light of the Columbine school shootings and other tragic attacks that have happened on school grounds, the Court wholly understands that school administrators and staff must be extra vigilant in protecting students.

---

[1] The individual defendants are named in their official capacities only.

School personnel who make these difficult decisions may not be familiar with the intricacies of First Amendment jurisprudence. Indeed, the Court respects the problems schools face on a daily basis, but it also has a duty to uphold the constitutional principle of free expression. Put simply, the Court's decision is a recognition of a student's right to freely express himself within the boundaries of the Constitution, and not an admonishment of the well-intentioned actions school officials take to ensure a stable educational environment. The Supreme Court said it best in Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969):

> It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years.

## II. OVERVIEW

### A. Parties

Plaintiff James Nixon ("James") is a minor currently residing with his parents in Licking County, Ohio. James is entering the eighth grade at Sheridan Middle School ("Sheridan") located in Thornville, Ohio. Sheridan is a public middle school comprising sixth, seventh, and eighth grade students with a total enrollment of approximately 570 students.

Plaintiffs John and Cathleen Nixon are the natural parents of James Nixon and reside in Licking County, Ohio. The Nixon family has resided within the boundaries of the Northern Local School District for eight years. The Nixons hold strong Christian beliefs and have attended two nondenominational churches during their eight years in the district.

Defendant Northern Local School District Board of Education ("Board of Education") is a political subdivision of the State of Ohio and is responsible for providing public education to

students attending its schools.  Sheridan Middle School is located in the Northern Local School District and is governed by the Board of Education.

Defendant Jack Porter is the superintendent of the Northern Local School District. Defendant Tom Dorman is principal of Sheridan Middle School.  He is the chief administrator of the middle school and supervises all teaching and nonteaching staff members.  Mr. Dorman reports to superintendent Jack Porter.  Defendant Rich Warren is the assistant principal of Sheridan Middle School.  His job responsibilities include handling disciplinary and attendance matters.  Mr. Warren reports to principal Tom Dorman.

### B.  Facts

The facts of this case are largely undisputed and the parties agree that an evidentiary hearing is not necessary.

Plaintiff James Nixon and his mother attended a church camp meeting in August 2004 where they purchased a T-shirt with written messages on the front and back (the "T-shirt").  The front of the shirt says:

> INTOLERANT
> Jesus said . . . I am the way, the truth and the life.
> John 14:6

The back of the shirt contains the following statements:

> Homosexuality is a sin!
> Islam is a lie!
> Abortion is murder!
> Some issues are just black and white!

The T-shirt is black with white lettering.

Prior to the first day of the 2004-2005 school year, James informed his parents that he wanted to wear the T-shirt to school.  Mr. Nixon warned his son that because of the nature of the

statements printed on the T-shirt, he might receive some opposition at school.  Mr. Nixon also told James that if someone asked him to remove the shirt and James was not satisfied with the reason, then he could refuse to remove it.  Finally, Mr. Nixon instructed James to call home if he was uncomfortable with the situation at school.

James wore the T-shirt on the first day of school, September 1, 2004.  After third period, a Sheridan guidance counselor saw the back of the shirt as James was standing near his locker.  The guidance counselor told James that the T-shirt was inappropriate for school and asked him to remove it or turn it inside-out.  James refused to do either.  The guidance counselor then escorted James to the principal's office.

The assistant principal, Rich Warren, met with James in his office.  Mr. Warren agreed with the guidance counselor and informed James that the message on his shirt was offensive and inappropriate.  Unless James removed the shirt or turned it inside-out, Mr. Warren would prohibit him from returning to class that day.  James informed Mr. Warren that he would neither remove the shirt nor turn it inside-out since he saw nothing inappropriate about the shirt's message and since his parents had given him permission to wear the shirt to school.  Mr. Warren then had a telephone conversation with James' father explaining that the T-shirt was offensive and was a violation of school policy.  Mr. Warren told Mr. Nixon that if James did not turn the T-shirt inside-out or remove it, James would not be permitted to return to class that day.  Since Mr. Nixon refused to direct James to comply with the school's request, Mr. Warren told Mr. Nixon that he could either pick James up from school or Mr. Warren would assign James to an alternative school for the day.

When Mr. Nixon arrived to pick up James, he spoke to Mr. Warren but could not reach

an agreeable solution. Mr. Nixon next spoke to the school principal, Tom Dorman, who concurred with the others concerning the offensive and disrespectful nature of the T-shirt. Mr. Dorman indicated that James needed to remove the shirt or turn it inside out. Further, Mr. Dorman told Mr. Nixon that if James returned to school wearing the T-shirt he would be suspended. Mr. Nixon refused to leave the school until he received a satisfactory answer as to why the shirt was offensive. Upon Mr. Nixon's refusal to leave school property, Mr. Dorman called the Perry County Sheriff's Office and a deputy sheriff arrived and took Mr. Nixon's statement. Eventually, James and his father left the school premises.

Still unsatisfied, John and Cathleen Nixon met with superintendent Jack Porter and principal Dorman on September 7, 2004. At this meeting, Mr. Dorman reiterated that James' T-shirt violated the school's policies. Superintendent Porter agreed and supported Mr. Dorman's decision to suspend James if he wore the shirt to school again. Plaintiffs initiated the present action several months later.

The school district's student handbook, under the section "Dress And Grooming," provides in relevant part the following rule: "Any fashion (dress, accessory, or hairstyle) that disrupts the educational process . . . will not be permitted. . . . The following styles or manners of dress are prohibited . . . clothing with suggestive, obscene, or offensive or gang related words and/or pictures. . . ." (Joint Ex. 1, p. 5). Likewise, under the section "Disruption of Educational Process," the handbook provides that "any actions or manner of dress that interfere with school activities or disrupt the educational process are unacceptable."[2] (Joint Ex. 1, p. 8). The school must exercise discretion in choosing which shirts violate the school's policy. In the past, the

---

[2] These two provisions of the student handbook will collectively be referred to as the "school policy" or "policy."

5

school has invoked this policy and asked other students to remove T-shirts with inappropriate messages.  Some examples are shirts that advertise alcohol, a shirt stating "You wear your X and I'll wear mine," a reference to Malcolm X, a shirt depicting a rebel flag, and a shirt with the Playboy Bunny logo.  Students wearing these T-shirts have complied with the school's request to change their shirts.  On the other hand, school officials allow potentially controversial T-shirts when they do not believe the shirts violate school policy.   Examples are shirts that contain names of modern bands, such as "Slipknot," "ICP" (Insane Clown Posse), "The Dark Carnival Presents Insane Clown Posse," and "Insane Clown Posse."  The school has also allowed a shirt containing a picture of President Bush with "International Terrorist" on his forehead asking "Which Side are You On?"  Finally, the school permitted a shirt that says "For Good Luck Rub My Belly."[3]

There is no evidence that James' T-shirt caused any disruption at the school.  James had never been disciplined for violating the school's policy before.  He has worn other shirts to school that contain religious messages such as "WWJD" referring to the phrase "What Would Jesus Do?"  James has not worn the prohibited shirt in question since the day he was confronted about it.

**C.  Procedural History**

The parties fully briefed the issue of preliminary injunction and the Court initially set a hearing for March 15, 2005.  The Court subsequently granted the parties' joint motion (Doc. 18) to push back the hearing and combine the preliminary injunction hearing with a trial on the

---

[3] Copies of photos of these permissible shirts are included in Joint Exhibit 2 (a-f).

merits.[4]  After conducting further discovery, the parties decided a hearing was no longer necessary and requested that the Court accept the case on the record.

### III.  STANDARD OF REVIEW

The Court must consider four factors in determining whether a preliminary injunction is proper in a given case: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.  Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati, 363 F.3d 427, 432 (6th Cir. 2004).  These factors are to be balanced against one another and should not be considered prerequisites.  Capobianco v. Summers, 377 F.3d 559, 561 (6th Cir. 2004).

### IV.  ANALYSIS

#### A.  Preliminary / Permanent Injunction

**1.  Likelihood of Success on the Merits**

Plaintiffs assert that defendants' actions prohibiting James from wearing the T-shirt constitute an unconstitutional violation of James' free speech rights under the First and Fourteenth Amendments.[5]

James' conduct in wearing his T-shirt clearly constitutes expression under the First

---

[4] This satisfies the notice requirement provided in Fed. R. Civ. P. 65(a)(1).

[5] Plaintiffs also originally asserted that the school's policy is unconstitutionally vague, although they have since abandoned that claim.

Amendment.  See Cohen v. California, 403 U.S. 15 (1971) (wearing a jacket with a political message is protected speech); Castorina v. Madison County Sch. Bd., 246 F.3d 536, 541 (6th Cir. 2001) (wearing a T-shirt with a Confederate flag constitutes protected speech).  Therefore, the relevant issue is the extent of a student's constitutional right to freely express himself on school grounds.

This issue must be evaluated under the Tinker - Fraser - Kuhlmeier trilogy of cases that carve out three categories of justifiably-regulated student speech.  The three categories can be summarized as follows:  (1) school-sponsored speech under Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988); (2) vulgar, lewd, obscene and plainly offensive speech under Bethel Sch. Dist. v. Fraser, 478 U.S. 675 (1986); and (3) speech that falls into neither category, but causes a material disruption, is reasonably likely to do so, or interferes with other students' rights as provided in Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969).  See Canady v. Bossier Parish Sch. Bd., 240 F.3d 437, 442 (5th Cir. 2001) (discussing the three categories of student speech); S.G. v. Sayreville Bd. of Educ., 333 F.3d 417, 421-22 (3rd Cir. 2003), cert. denied, 540 U.S. 1104 (2004) (same).  These three categories are essentially a balance between a student's right to free expression and the ability of schools to carry out their educational mission.  Defendants concede that the message on James' T-shirt was not school-sponsored speech and the case therefore falls outside the realm of Kuhlmeier.  Rather, defendants argue that James does not have a constitutional right to wear the shirt to school since its message is plainly offensive (under Fraser) and invades on the rights of others (under Tinker).

In Bethel Sch. Dist. v. Fraser, 478 U.S. 675 (1986), a high school student was suspended from school for giving a sexually explicit nomination speech at a school assembly.  Throughout

8

the student's speech, he continually referred to his candidate in terms of an elaborate, graphic, and explicit sexual metaphor. In response to his suspension, the student and his father brought an action against the school alleging violations of his First Amendment right to free expression. The Supreme Court ruled in favor of the school. The Court explained:

> The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior. Even the most heated political discourse in a democratic society requires consideration for the personal sensibilities of the other participants and audiences.

Fraser, 478 U.S. at 681. The Court went on to say that "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." Id. at 683. Applying these principles to the facts of the case, the Court found that the pervasive sexual metaphor in the student's speech was "plainly offensive." The Court further found that "[t]he First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as respondent's would undermine the school's basic educational mission." Id. at 685. Thus, a school may prohibit vulgar, lewd, obscene and plainly offensive speech since it undermines a school's basic educational mission.[6]

Other courts have applied this principle to a variety of student speech cases. For example, in Boroff v. Van Wert City Bd. of Educ., 220 F.3d 465 (6th Cir. 2000), cert. denied, 532 U.S. 920 (2001), a high school student brought a First Amendment claim against his school after

---

[6] See Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 213 (3rd Cir. 2001) ("According to Fraser, then, there is no First Amendment protection for lewd, vulgar, indecent, and plainly offensive speech in school.") (internal quotations and citations omitted); Canady, 240 F.3d at 442 ("The second category of regulated student expression involves lewd, vulgar, obscene, or plainly offensive speech."); Chandler v. McMinnville Sch. Dist., 978 F.2d 524, 528-29 (9th Cir. 1992)("The decision in Fraser rested on the vulgar, lewd, and plainly offensive character of [the] speech. . . .") (internal quotations omitted).

he was told that he was not allowed to wear "Marilyn Manson" T-shirts to school.[7] The student had previously worn Marilyn Manson T-shirts on five separate days and was told not to return to school wearing any of them. One such shirt showed a three-faced Jesus accompanied by the words "See No Truth. Hear No Truth. Speak No Truth." Marilyn Manson's name was displayed on the front of the shirt. On the back of the shirt, the word "BELIEVE" was displayed with the letters "LIE" highlighted. The Sixth Circuit applied Fraser and found the school's actions were not unconstitutional. The Court reasoned that since Marilyn Manson sings about such topics as suicide, murder, and drugs, and a Marilyn Manson T-shirt can reasonably be considered a communication agreeing with the views associated with the singer, the school's actions were reasonable. Essentially, the school was justified in prohibiting a T-shirt that "contains symbols and words that promote values that are so patently contrary to the school's educational mission. . . ." Id. at 470.

Various district courts have also addressed this issue. In Smith v. Mount Pleasant Pub. Sch., 285 F. Supp.2d 987 (E.D. Mich. 2003), a high school suspended one of its students for reading aloud a commentary about the school's tardy policy. In ruling for the school, the district court stated that the portion of the student's commentary referring to the sexual activity of school administrators constituted "lewd and vulgar speech, which falls into the category of sanctionable expression under Fraser."[8] Id. at 997. However, district courts have also found Fraser inapplicable to some cases. See, e.g., Barber v. Dearborn Pub. Sch., 286 F. Supp.2d 847, 856

---

[7] Marilyn Manson is the stage name of the popular "goth" rock performer Brian Warner, and also the name of the band in which Warner is the lead singer.

[8] This was only part of the reason for the Court's decision. The Court also focused on the Tinker analysis as discussed *infra*.

(E.D. Mich. 2003) (Fraser inapplicable to a student's shirt displaying a photo of George W. Bush and the phrase "International Terrorist" since the shirt did not refer to alcohol, drugs, or sex and was neither obscene, lewd, nor vulgar); Bragg v. Swanson, 371 F. Supp.2d 814, 823 (W.D. W. Va. 2005) (Fraser inapplicable to a student wearing a Confederate flag shirt since the display of the flag is not per se and patently offensive).

Defendants contend their decision to prohibit James' T-shirt is properly justified under the Fraser "plainly offensive" standard. The Court disagrees. Although other Sheridan students may not agree with the messages displayed on James' shirt, the shirt still fails to qualify as plainly offensive. Fraser and its progeny of cases all deal with speech that is offensive because of the manner in which it is conveyed. Examples are speech containing vulgar language, graphic sexual innuendos, or speech that promotes suicide, drugs, alcohol, or murder.[9] Rather than being concerned with the actual content of what is being conveyed, the Fraser justification for regulating speech is more concerned with the plainly offensive manner in which it is conveyed. See Castorina, 246 F.3d at 542; East High Gay/Straight Alliance v. Bd. of Educ. of Salt Lake City Sch. Dist., 81 F. Supp.2d 1166, 1193 (D. Utah 1999).

Speech that contains a potentially offensive political viewpoint is not included in this category of regulated expression. See, e.g., Barber, 286 F. Supp.2d at 856 (George W. Bush "International Terrorist" T-shirt); Bragg, 371 F. Supp.2d at 823 (Confederate flag T-shirt). In fact, several courts have explicitly stated that speech conveying a political message is properly analyzed under Tinker (which is discussed *infra*) rather than Fraser. See, e.g., Fraser, 478 U.S.

---

[9] It could be argued that, notwithstanding its application of Fraser, the Court in Boroff was actually more concerned with content than with the manner of expression. However, the Boroff case dealt with a narrow category of speech (i.e. glorifying suicide, drugs, and murder) that is not at issue in James' case.

11

at 685 ("Unlike the sanctions imposed on the students wearing armbands in Tinker, the penalties imposed in this case were unrelated to any political viewpoint."); Canady, 240 F.3d at 442; Smith, 285 F. Supp.2d at 997. Clearly, James' shirt is not plainly offensive based on the manner in which its message is conveyed. Rather, any offensive characteristics of James' shirt stem from the views espoused thereon, thus rendering it necessary to analyze this case under Tinker.[10]

Defendants rely heavily on Boroff to justify prohibiting James from wearing his T-shirt. Yet, Boroff is clearly distinguishable from the present case. As already discussed, the Sixth Circuit's reason for upholding the school's prohibition of Marilyn Manson T-shirts was the fact that wearing the shirts promoted suicide, drugs, and murder. The Court stated: "The record is devoid of any evidence that the T-shirts, the 'three-headed Jesus' T-shirt particularly, were perceived to express any particular political or religious viewpoint." Boroff, 220 F.3d at 470. Defendants focus on the fact that the shirt in Boroff contained a three-faced Jesus picture and argue that the holding therefore applies to James' case. However, the Court in Boroff dismisses any notion that its decision is based on any religious quality of the Marilyn Manson T-shirt:

> The dissent primarily relies on one sentence in Principal Clifton's affidavit, in which Clifton stated that he found the "three-headed Jesus" T-shirt to be offensive because "it mocks a major religious figure." . . . In our view, however, the evidence does not support an inference that the School intended to suppress the expression of Boroff's viewpoint, because of its religious implications. Rather, the record demonstrates that the School prohibited Boroff's Marilyn Manson T-shirts generally because this particular rock group promotes disruptive and demoralizing values which are inconsistent with and counter-productive to education.

Id. at 470-71. In response to the suggestion that the one T-shirt featuring the distorted Jesus figure may have been prohibited because of its religious message, the Court added:

---

[10] The Court rejects defendants' assertion that the "words on the back of James' shirt are, in fact, offensive in nature." (Def. Supp. Mem. at 12). None of the actual words on James' shirt compare in offensiveness to the sexually explicit, vulgar, and plainly offensive words expressed in the Fraser line of cases.

12

> In our view, the School's treatment of the "three-headed Jesus" T-shirt and the others is not distinguishable. The record establishes that all of the T-shirts were banned in the same manner for the same reasons–they were determined to be vulgar, offensive, and contrary to the educational mission of the school.

Id. at 471. Therefore, defendants' reliance on Boroff is misplaced.

In Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969), several high school students brought a First Amendment claim after they were suspended for wearing black armbands to school in protest of the Vietnam war. The Supreme Court declared that the school's actions could only be constitutionally upheld if the armbands caused a material disruption of school activities, raised a reasonable likelihood of disruption, or invaded on the rights of others. Id. at 513-14. The record indicated that there was no disruption of school activities. Notwithstanding a few hostile remarks from students outside the classroom, no threats or acts of violence ever occurred. In explaining its decision, the Court stated that "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Id. at 508. The Court further added:

> In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.

Id. at 509. Since the school in Tinker clearly could not meet this standard, the Court found the school's actions unconstitutional.

In Castorina v. Madison County Sch. Bd., 246 F.3d 536 (6th Cir. 2001), a high school suspended two of its students for wearing T-shirts displaying the Confederate flag. Following their suspensions, the students brought suit challenging the constitutionality of the school's actions. The Court found the case most analogous to Tinker and remanded it to the district court

13

to determine whether or not there had been past racial violence that would justify banning the Confederate flag from school. Id. at 544. Any history of racial violence would undermine the students' claim because of the potential for material disruptions of school activities.

Several other circuit courts have applied Tinker and upheld a school's decision to prohibit displaying the Confederate flag. See, e.g., Melton v. Young, 465 F.2d 1332 (6th Cir. 1972) (explaining how in the four years since the high school was racially integrated, the school had experienced significant racial tension); West v. Derby Unified Sch. Dist., 206 F.3d 1358 (10th Cir. 2000) (explaining how there had been actual fights at school involving racial symbols, particularly the Confederate flag); Scott v. Sch. Bd. of Alachua County, 324 F.3d 1246 (11th Cir. 2003), cert. denied, 540 U.S. 824 (2003) (discussing the school's history of racial tensions including racially based altercations). Furthermore, two district courts have also used Tinker to justify the regulation of student speech. See Smith v. Mount Pleasant Pub. Sch., 285 F. Supp.2d 987 (E.D. Mich. 2003) (student's speech caused a disruption when other students were visibly upset, tried to avoid the student's speech, and complained to school officials about the speech); Walker-Serrano v. Leonard, 168 F. Supp.2d 332 (M.D. Penn. 2001) (student's speech had caused a classroom disruption in the past and the school reasonably concluded that another disruption was likely). On the other hand, when no disruption occurs and no reasonable threat of any disruption exists, district courts uphold a student's right to express political viewpoints under Tinker. See, e.g., Barber, 286 F. Supp.2d at 856-57; Bragg, 371 F. Supp.2d at 827; Chalifoux v. New Caney Indep. Sch. Dist., 976 F. Supp. 659, 667 (S.D. Tex. 1997); Clark v. Dallas Indep. Sch. Dist., 806 F. Supp. 116, 120 (N.D. Tex. 1992).

Defendants concede that James' shirt did not cause any disruptions at school. (Def.

14

Supp. Mem. at 10).  They do assert, however, that the shirt had the potential to cause a disruption.  This is presumably based on the fact that the school includes students and/or staff members who are Muslims, homosexuals, and those who have had abortions.  The mere fact that these groups exist at Sheridan Middle School, and the fact that they could find the shirt's message offensive, falls well short of the Tinker standard for reasonably anticipating a disruption of school activities.

      The Supreme Court has pronounced that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."  Tinker, 393 U.S. at 508.  Unlike the previous cases where regulation of student speech has been upheld under Tinker, defendants in this case have offered no evidence of any history of violence or disorder in the school or any other circumstances that would justify a reasonable likelihood of disruption, beyond the mere fact that there are groups of students and/or staff that could likely find the shirt's message offensive.[11]  James himself has indicated that throughout his morning bus ride and morning classes, no student or teacher made any negative comments or expressed any problems with the T-shirt.  (Nixon Dep. at 38-39).  Put simply, the school's decision to ban James' T-shirt was more than likely caused by "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."  Tinker, 393 U.S. at 509.  And just as in Tinker, the school's actions "appear to have been based upon an urgent wish to avoid the controversy which might result from the expression. . . ."  Id. at 510.  The Supreme Court has directly stated that the regulation of a student's political viewpoint requires more than this.  The defendants in this case have failed to satisfy this burden.

---

[11] If the mere fact that other students will likely find a message offensive justified a school's regulation of expression, then a student's right to freely express himself would be greatly diminished.

15

Defendant's final attempt to justify their actions rests on the notion that James' T-shirt invades on the rights of others at school. It is true that, according to <u>Tinker</u>, schools can regulate speech that invades on the rights of others. However, besides citing this general language from <u>Tinker</u>, defendants point to no authority interpreting what "invasion on the rights of others" really entails. In fact, the Court is not aware of a single decision that has focused on that language in <u>Tinker</u> as the sole basis for upholding a school's regulation of student speech. As already discussed, the <u>Tinker</u> line of cases focus on whether or not material disruptions have occurred or whether or not they are reasonably likely to occur. The Supreme Court's language in <u>Tinker</u> sheds some light on the idea of invading on the rights of others:

> The school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners. There is here no evidence whatever of petitioners' interference, actual or nascent, with the school's work *or of collision with the rights of other students to be secure and to be let alone*. Accordingly, this case does not concern speech or action that intrudes upon the work of the schools *or the rights of other students*.

<u>Tinker</u>, 393 U.S. at 508 (emphasis added). Thus, invading on the rights of other students entails invading on other students' rights to be secure and to be let alone. Just as in <u>Tinker</u>, there is no evidence that James' silent, passive expression of opinion interfered with the work of Sheridan Middle School or collided with the rights of other students to be let alone. Therefore, the Court rejects defendants' assertion that James' T-shirt invaded on the rights of others.

In conclusion, defendants have clearly violated James' First and Fourteenth Amendment rights by prohibiting him from wearing his T-shirt.

## 2. Irreparable Injury

The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even

16

minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). The likelihood of success on the merits will usually be the determinative factor of whether or not to issue a preliminary injunction in a First Amendment case. Connection Distributing Co. v. Reno, 154 F.3d 281, 288 (6th Cir. 1988). Since plaintiffs have demonstrated a strong likelihood of success on the merits of their First Amendment claim, the Court finds James will suffer irreparable injury if the preliminary injunction is not issued.

### 3. Harm to Others & Public Interest

The harm to other parties will be minimal if James is allowed to wear his T-shirt to school. Defendants will not suffer any harm if they are enjoined from enforcing an unconstitutional policy against James. Further, other students will not be harmed since defendants have failed to show any reasonable likelihood of material disruptions. As previously noted, other students' mere disagreement with the message on James' T-shirt is not enough to outweigh James' constitutional right to free expression.

Finally, protection of constitutional rights, and particularly First Amendment rights, is always in the public interest. See Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 383 (1979); G & V Lounge, Inc. v. Michigan Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994).

In conclusion, all four factors support the issuance of a preliminary and permanent injunction in this case. Therefore, the Court GRANTS plaintiff's motion to enjoin defendants from prohibiting James from wearing his T-shirt.

### B. Additional Issues

In defendants' supplemental memorandum, they ask the Court to dismiss the claims against the individual defendants based on qualified immunity. (Def. Supp. Mem. at 20).

However, the individual defendants–Jack Porter, Tom Dorman, and Rich Warren–are named in their official capacities only. The defense of qualified immunity protects officials only from individual liability for money damages. Flagner v. Wilkinson, 241 F.3d 475, 483 (6th Cir. 2001). Therefore, to the extent defendants move for dismissal based on qualified immunity, the motion is denied.

Finally, plaintiffs also seek nominal damages of one dollar and ask the Court to name them prevailing parties. Because the Court has declared defendants' treatment of James unconstitutional, and the plaintiffs are entitled to a preliminary and permanent injunction, the Court grants plaintiffs' request for nominal damages of one dollar and declares them prevailing parties for purposes of 42 U.S.C. § 1988.

## V. DISPOSITION

For all of the foregoing reasons, the Court GRANTS plaintiffs' motion for a preliminary and permanent injunction. The Court permanently enjoins the defendants and their agents from prohibiting James Nixon from wearing his T-shirt to school, unless defendants can demonstrate that the shirt is substantially disrupting or interfering with the school's activities or that an imminent and substantial disruption is likely to occur. As long as the shirt is not substantially disrupting or interfering with the school's activities and an imminent and substantial disruption is not likely to occur, James shall be entitled to wear his T-shirt to school without any repercussions from the defendants and/or their agents.

Plaintiffs are also entitled to one dollar in nominal damages and shall be prevailing parties for purposes of 42 U.S.C. § 1988.

The Clerk shall remove Doc. 3 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

/s/ George C. Smith<br>**GEORGE C. SMITH, JUDGE**<br>United States District Court